**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James J. "Buck" ALLEMAND, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Thomas Lee "Tom" ALLEMAND, Defendant–Appellant.**

**Nos. 93–8071, 93–8072.**

United States Court of Appeals, Tenth Circuit.

Aug. 8, 1994.

Weston W. Reeves, Reeves, Murdock & Gifford, Casper, WY, for appellants.

John R. Barksdale, Asst. U.S. Atty. (David A. Kubichek, Asst. U.S. Atty., with him, on the brief), D. Wyoming, Casper, WY, for appellee.

Before SEYMOUR, Chief Judge, ANDERSON, Circuit Judge, and DAUGHERTY,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

James and Thomas Allemand appeal their convictions for crimes arising from a scheme to export illegally taken wildlife. They also appeal their sentences and the district court's denial of their motion for acquittal or a new trial. We affirm all three.

## BACKGROUND

James and Thomas Allemand ran an outfitting and guiding business on their Wyoming ranch. In 1987 and 1988 James Allemand arranged a big-game hunt for eleven Canadian hunters. In October 1988, the Allemands and several others guided the Canadians on the hunt. All of the Canadians killed deer without a Wyoming deer license, and several illegally killed other animals as well.

The Allemands arranged for Terrence Vruno, a Minnesota taxidermist, to film the hunt. At the end of the hunt, the Canadians also agreed to pay Vruno for preparing trophy mounts of the animals they had killed. The Allemands later sent the hides and such to Vruno in Minnesota, where he was to prepare them then ship them to Canada.

Ruth Vruno, Terrence Vruno's wife, prepared export declaration forms for the trophies using license numbers of hunters other than the Canadians. Government agents confiscated these false export declaration forms during a records inspection in February 1990, then copied and returned them. The government confiscated the game trophies the next month, so the Vrunos never shipped the trophies or filed export declaration forms.

The government tried the Allemands along with four of the hunting guides. The jury convicted the Allemands of conspiring to export illegally taken wildlife and to file false records concerning wildlife intended for export. *See* 16 U.S.C. §§ 3372(a)(2)(A), (d), 3373(d)(1)(A). The jury also convicted them of aiding and abetting the Canadians in causing Terrence Vruno to attempt to export illegally taken wildlife. *See id.* § 3372(a)(2)(A), (a)(4); 18 U.S.C. § 2. After the court denied their motion for acquittal or a new trial, the Allemands appealed.

## DISCUSSION

I. Jury Instructions

A. *Proposed instruction on duty to file export forms*

■ The Allemands complain that the district court made several mistakes in its instructions to the jury. One of those alleged mistakes is that the court did not give the Allemands' proposed Instruction 10. The proposed instruction would have quoted the regulations that require filing export declarations. *See* 50 C.F.R. §§ 14.63–.64. The Allemands argue that the second objective of their conspiracy, to make or submit false records concerning wildlife intended for export, would not be unlawful if they had no duty to file those records.

The court did not err by refusing this proposed instruction because making or submitting false records is illegal regardless of whether one has a duty to submit those records. The indictment did not charge the Allemands with conspiracy to violate a duty to file the forms, or even a duty to file truthful forms. Their case therefore differs from the case on which they mainly rely, in which the government had to prove a conspiracy to violate a duty to make certain disclosures. *See United States v. Irwin,* 654 F.2d 671, 680 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), *overruled on other grounds by United States v. Daily,* 921 F.2d 994 (10th Cir.1990),

---

* The Honorable Frederick A. Daugherty, Senior Judge, United States District Court for the North- ern, Eastern and Western Districts of Oklahoma, sitting by designation.

*cert. denied,* —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991). The statute the Allemands conspired to violate makes it "unlawful for any person to make or submit any false record" for any wildlife "which has been, or is intended to be ... transported in ... foreign commerce." 16 U.S.C. § 3372(d)(2)(A). Making or submitting false forms violates this law regardless of whether one has a duty to file them. *See United States v. Kingston,* 971 F.2d 481, 488 (10th Cir.1992) (explaining that falsely stating that person paid earnest money and closing costs violates statute forbidding false statements regardless of whether the law required the person to have paid earnest money and closing costs).

### B. Proposed instruction on Lacey Act amendment

The Allemands also challenge the court's refusal to give their proposed Instruction 7, which quoted the relevant Lacey Act provisions before and after an amendment that became effective November 14, 1988. They also challenge the court's refusal to give their proposed Instruction 1, which gave their defense theory based on that amendment.

They argue that refusing these instructions was wrong because the government had to prove that they specifically intended to conspire to violate the law as amended in November 1988. The indictment charges that one of the conspiracy's objects was to "knowingly and intentionally make and submit false records concerning wildlife intended to be transported in foreign commerce." Appellants' App. at 19. This charge is consistent with 16 U.S.C. § 3372(d)(2) as amended. Before November 1988, however, the applicable statute only forbade making false records concerning wildlife that had already been exported. *See id.* § 3372(a)(4) (1984).

■ We agree with the Allemands that the conspirators could not have specifically intended to violate a law when it did not exist. Evidence of a conspiracy to make or submit false forms before November 1988 could not support their conviction of the charged offense. *See United States v. Brown,* 555 F.2d 407, 419 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55

L.Ed.2d 494 (1978). However, the government did not have to prove that the conspirators intended to violate the later version of the statute in 1987 when the conspiracy began. · Instead the government could simply prove that the conspirators adopted this second object after November 1988.

Although the court should have told the jury that the Allemands must have belonged to a conspiracy with this second object after November 1988, we will not reverse because its failure to do so did not prejudice the Allemands. *See United States v. Agnew,* 931 F.2d 1397, 1410 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 237, 116 L.Ed.2d 193 (1991). Although the Allemands stress that most of the overt acts occurred before November 1988, those acts only demonstrated a conspiracy to export illegally taken wildlife, the first alleged object. Almost all the evidence and alleged overt acts specifically relating to the false records objective are from late 1989 or 1990, well after the Lacey Act amendment was effective. *See* Appellants' App. at 31–32. If the jury did conclude that the conspirators intended to file false forms, it could only have done so on the basis of evidence that followed the amendment's effective date, and thus would support a finding of specific intent.

■ The Allemands also complain that the jury might have violated the ex post facto clause by finding them guilty of conspiracy to file false records based on overt acts that occurred before the acts were illegal. This possibility does not require or justify the proposed instruction, however, because the jury could not decide whether the indictment violated the ex post facto clause. That is a legal question for the judge to decide.

■ The Allemands apparently did not raise this legal challenge to the indictment before the trial court. Although they mainly argue that the failure to instruct the jury was error, we will assume that they also claim the ex post facto violation was a plain legal error that we should recognize even though they did not raise the issue below. Again, however, the overt acts relating to filing false records all occurred well after the amendment, and the evidence clearly establishes a con-

spiracy to make false records after the amendment was effective. The Allemands therefore could not possibly have been convicted of the conspiracy to file false forms on the basis of conduct that was not illegal at the time. *See United States v. Todd,* 735 F.2d 146, 149–50 (5th Cir.1984) (holding that because all but two alleged overt acts furthering conspiracy occurred after Lacey Act amendments, the failure to instruct the jury that it must find evidence of a conspiracy after the effective date of the amendments was not plain error), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

### C. Instruction on attempt in Count II

■ Count II charged the Allemands with aiding and abetting the Canadian hunters in causing Terrence Vruno to attempt to export illegally taken wildlife. Instruction 34 explained the aiding and abetting charge. The final paragraph told the jury that "the government must also prove, beyond a reasonable doubt, that someone committed each of the essential elements of the offense charged as detailed for you in Instruction No. ..." Appellants' App. at 126. This instruction should have referenced only Instruction 32, which described the attempt elements. However, the judge insisted on writing in 8 and 32, despite the Allemands' objection.

Even though this was wrong, we will not reverse the conviction because the error did not prejudice the Allemands. *See Agnew,* 931 F.2d at 1410. We disagree with the Allemands that the jury could have thought the conspiracy offense described in Instruction 8 and the attempt offense described in Instruction 32 were the same. We may assume that the jury would have followed the judge's directions to cross-reference both of those instructions, and would have readily seen that they were not the same. Although they might have been confused, any possible confusion would have favored the Allemands. If they didn't realize the judge's mistake, they could only make sense of this part of Instruction 34 by concluding that the government must prove the elements described in both instructions, not just either of the two.

### D. Instructions 32 and 33

■ The Allemands complain that Instructions 32 and 33 imply that the government had charged them with an attempt to illegally export wildlife in Count II. Those instructions describe the elements and proof of attempt by saying the government must prove that "the defendants" intended to commit the crime and took a substantial step toward committing it. Appellants' App. at 122–23. The first instruction on Count II, Instruction 27, named the Allemands among "the defendants," but did not call Terrence Vruno a defendant. *Id.* at 117. The Allemands argue that the jury therefore might have improperly relied on attempt evidence in finding them guilty of aiding and abetting the Canadian hunters in causing Vruno's attempted illegal exportation.

The trial judge should have been more exact about who the government had to prove attempted to illegally export wildlife. We will not reverse the Allemands' conviction on Count II, however, because the court's mistake was not an error in light of the instructions as a whole, and even if it were, it did not prejudice the Allemands at all. *See Agnew,* 931 F.2d at 1410.

First, the instructions also clearly told the jury that the Allemands were not on trial for any crime not alleged in the indictment. Appellants' App. at 83. Both the indictment and the court's description of Count II clearly charge the Allemands only with aiding and abetting the Canadian hunters in causing Vruno to attempt to illegally export wildlife. *See id.* at 33–34, 80, 117. The jury would not have found the Allemands guilty of a different charge just because the description of its elements used the general term "defendants" that the court used in a different instruction to refer to the Allemands. Rather, the jury would conclude that "defendants" in the attempt instruction generically referred to those accused of attempt, and would focus on the aiding and abetting instruction, Instruction 34, in deciding whether the Allemands were guilty on Count II. *See id.* at 125–26.

Second, if the jury did instead find the Allemands guilty of attempt as described in Instruction 32, those same elements would more than prove that they aided and abetted

the Canadians in causing the attempt. The first attempt element is that the defendants intended to illegally export wildlife. *Id.* at 122. If the jury found that the government had proven this element as to the Allemands, it would also necessarily find that the Allemands "knew that the crime charged was to be committed" and that they "acted with the intention of causing the crime charged to be committed." *Id.* at 125–26. The second attempt element is that "the defendants did an act constituting a substantial step towards the commission of that crime." *Id.* at 122. Such proof would also prove that the Allemands "knowingly did some act for the purpose of aiding ... the commission of that crime." *Id.* at 125.

The Allemands might complain that if the jury was confused, it might not have found that the Canadian hunters caused Vruno's attempt, nor that Vruno attempted the crime. All the evidence, however, indicated that the Allemands themselves did not take action to export the wildlife to Canada. If the jury mistakenly focused on the attempt elements rather than the aiding and abetting elements, it could only have returned a guilty verdict by concluding that the Allemands intended Vruno to actually export the wildlife and that their act towards that end was simply facilitating the exportation.

## II. Permitting Opinion on Guilt

■ The Allemands argue that the judge improperly allowed Terrence Vruno to express his opinion that they were guilty of conspiracy in Count I. After the government's repeated efforts to phrase an acceptable question, and the defendants' repeated objections, Vruno named the Allemands and others in response to the question, "With whom did you conspire?" *See* Appellants' App. at 377–83. We will not reverse the trial court's decision to permit this testimony because the court did not abuse its discretion. *See United States v. McIntyre,* 997 F.2d 687, 698 (10th Cir.1993); *Karns v. Emerson Elec. Co.,* 817 F.2d 1452, 1459 (10th Cir.1987).

We disagree that Vruno expressed his opinion that the Allemands were guilty. As the judge made clear, Vruno only testified that he had pled guilty to conspiring with the

Allemands and the others. He did not offer a legal conclusion that the Allemands were guilty of conspiracy, nor would the jury have taken it that way. Allowing testimony about the details of a witness's guilty plea is not an error. *See United States v. Davis,* 766 F.2d 1452, 1456 (10th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985).

■ However, "the trial judge should specially instruct the jury about the permissible purposes" of such evidence and that the plea "cannot form the basis of any inference of the guilt of the defendant." *Id.* Since the Allemands did not ask for such an instruction or object to its absence, we may reverse for this reason only if it "was so egregious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Id.* at 1456–57. We conclude that failure to explain the permissible purposes for Vruno's testimony was not such plain error because of "the overwhelming evidence of guilt present in this record." *Id.* at 1457. The record leaves no doubt that the Allemands conspired with Vruno and others to kill wildlife illegally, to transport the wildlife to Vruno so that he could prepare trophies for shipment to Canada, and to prepare records with incorrect license numbers so that Vruno could export the trophies. Vruno's testimony that he pled guilty to conspiring with them could not possibly have affected the jury's decision.

## III. Conviction of Co–Defendants for Different Conspiracy

■ After trial the Allemands moved for acquittal or a new trial because the government did not prove a single conspiracy as the indictment alleged. Instead, the jury convicted the other four defendants of a different conspiracy, to violate interstate transportation laws. Appellants' App. at 173. The Allemands appeal the court's denial of their motion.

The Allemands object that because the indictment charged a single conspiracy, the jury might have found them guilty on the basis of evidence relating to the different conspiracy of which the other defendants were convicted. *See Kotteakos v. United*

*States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). This case is not at all like *Kotteakos,* however. *Kotteakos* stressed that eight conspiracies were involved, not just two, and that the many participants in the conspiracies had nothing to do with each other. *See id.* at 758, 766, 66 S.Ct. at 1244, 1248; *see also Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

In fact, although the jury did convict the other defendants of a different offense, that offense was not distinct. They did not conspire separately from the Allemands. Their conspiracy to violate interstate transportation laws was simply a lesser included offense. It was part of the same conspiracy of which the Allemands were convicted, which involved shipping the wildlife across state lines then out of the country. The presentation of evidence related to this "different" conspiracy therefore did not surprise the Allemands. *See United States v. Cova,* 755 F.2d 595, 599 (7th Cir.1985), *overruled on other grounds by United States v. Schmuck,* 840 F.2d 384 (7th Cir.1988). Nor might the jury have transferred guilt to the Allemands based on "evidence relating to conduct of a co-defendant in which the accused did not participate." *See United States v. Cardall,* 885 F.2d 656, 670 (10th Cir.1989). Although that same evidence may have established a lesser conspiracy among other defendants, it also established the conspiracy with which the Allemands were charged. The jury did not convict the Allemands of an offense with which they were not charged by indictment, nor did it consider any evidence related only to a different conspiracy.

IV. Sentencing Objections

A. *"Specially protected" wildlife*

██ The district court enhanced the Allemands' sentences by one point because the "market value of the fish, wildlife, or plants exceeded $2,000." USSG § 2Q2.1(b)(3)(A). The Allemands concede that the court properly applied the sentencing guideline in effect at the time of sentencing. However, they argue that applying the current guideline violated the ex post facto clause because at the time of their offense this enhancement only applied "[i]f the market value of the

specially protected fish, wildlife, or plants exceeded $2,000." USSG § 2Q2.1(b)(3)(A) (1989); *see also United States v. Underwood,* 938 F.2d 1086, 1090 (10th Cir.1991) ("[T]he *ex post facto* clause prohibits retroactive application of a changed guideline if the change disadvantages the defendant.").

We disagree that the 1991 amendment deleting "specially protected" changed the meaning or application of this enhancement. Before November 1989, a separate guideline covered Lacey Act violations. *See* USSG § 2Q2.2 (1988). That guideline provided the same enhancement for market value over $2,000, without requiring that the wildlife be "specially protected." *Id.* § 2Q2.2(b)(3)(A). The Sentencing Commission did not intend to narrow the scope of this enhancement when it included Lacey Act violations in section 2Q2.1, which had the very same enhancement but referred to "specially protected" wildlife because that section applied to violations of the Endangered Species Act and the like. Two years later the Commission deleted "specially protected," presumably because it might be confusing after the inclusion of Lacey Act violations. *See* USSG § 2Q2.1(b)(3)(A) (1991); USSG App. C, amend. 407 (1991) ("This amendment removes language inadvertently retained when this guideline was consolidated with the former § 2Q2.2.").

██ We interpret the 1989 guideline in light of this 1991 amendment clarifying its meaning. *See United States v. Atkinson,* 966 F.2d 1270, 1276 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *United States v. Saucedo,* 950 F.2d 1508, 1514 (10th Cir.1991). Deleting language that was "inadvertently retained" may seem more like a substantive correction than a "clarification." *See United States v. Menon,* 24 F.3d 550, 567 (3d Cir. 1994). However, even with the inadvertent modifier, the market value enhancement depended only on the wildlife's market value, not on its "specially protected" status. The Allemands do not dispute that section 2Q2.1 applied to all violations of the Lacey Act. *See* USSG § 2Q2.1, comment. (backg'd.) (1989). The market value enhancement directs an increase in the offense level "[i]f the

market value of the specially protected fish, wildlife, or plants exceeded $2,000." *Id.* § 2Q2.1(b)(3)(A). The enhancement thus assumes that any offense covered by this section involves "specially protected fish, wildlife, or plants." *See id.* § 2Q2.1, comment. (backg'd.) ("An additional enhancement is provided where the market value of the species exceeded $2,000....."). If the enhancement were to apply only to some subset of wildlife, it would say something like, "If the offense involved specially protected fish, wildlife, or plants with a market value exceeding $2,000," or at least, "If the market value of specially protected fish, wildlife, or plants exceeded $2,000." As written, however, the enhancement clearly assumes that every offense covered by this section involves some quantity of "specially protected fish, wildlife, or plants." Since the Guidelines do not define "specially protected" and use that term elsewhere only in the title of section 2Q2.1, we must interpret "specially protected wildlife" to mean simply any wildlife that might be involved in the violation of one of the statutes to which this section applies.

This interpretation is consistent with the two unconsolidated sections before 1989, both of which applied the market value enhancement regardless of what type of wildlife was involved. The 1991 amendment did not change the application of the consolidated market value enhancement, but merely clarified that "specially protected" never did limit the enhancement to offenses involving certain types of wildlife. *See Atkinson,* 966 F.2d at 1276. *But see Menon,* 24 F.3d at 565–67.

### B. Enhancement for organizing or leading

██ The court increased James Allemand's sentence by four levels because he was the "organizer or leader of a criminal activity that involved five or more participants." USSG § 3B1.1(a). He does not argue on appeal that he was not an organizer or leader. Rather, he argues that the activity did not involve five or more participants because the Canadian hunters unknowingly violated Wyoming laws and all but three defendants were convicted of lesser offenses.

The other defendants were participants even though they were convicted of lesser offenses. A "participant" in section 3B1.1 is one who is "criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1, comment. (n. 1). A participant need not be guilty of the offense for which the defendant is sentenced. *See United States v. Belletiere,* 971 F.2d 961, 969–70 (3d Cir.1992). Participants are "criminally responsible" for the offense if "their own criminal conduct made it possible." *Id.* at 970; *see also United States v. Inigo,* 925 F.2d 641, 659 (3d Cir.1991) ("[Participants] include persons who are used to facilitate the criminal scheme."); *United States v. Manthei,* 913 F.2d 1130, 1135–36 (5th Cir.1990). The four defendants who were guilty of conspiracy to transport illegally taken wildlife across state lines clearly facilitated and made possible the Allemands' conspiracy to export illegally taken wildlife. Therefore more than five participants were involved, and the court correctly increased James Allemand's sentence for organizing and leading the criminal activity.

### C. Enhancement for managing or supervising

Thomas Allemand likewise challenges the trial court's three-level enhancement of his sentence for managing or supervising a criminal activity involving five or more participants. *See* USSG § 3B1.1(b). Besides arguing that five participants were not involved, which we have already rejected, Thomas also argues that he did not manage or supervise the criminal activity.

██ We must accept the district court's finding that Thomas was a manager or supervisor because that finding is not clearly wrong. *See United States v. Levine,* 983 F.2d 165, 168 (10th Cir.1992). A supervisor is one who "exercised some degree of control over others involved in the commission of the offense or ... must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Reid,* 911 F.2d 1456, 1464 (10th Cir.1990) (quoting *United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990)), *cert. denied,* 498 U.S. 1097, 111 S.Ct. 990, 112

L.Ed.2d 1074 (1991); *see also United States v. Roberts,* 14 F.3d 502, 524 (10th Cir.1993) (stating that a manager or supervisor must have "decision-making authority or control over a subordinate"). The court could have concluded that Thomas had control and decision-making authority over the Vrunos because they called him about the lack of valid license numbers and he directed them to use a list of license numbers that he provided. *See* Appellants' App. at 367, 398–99. Although the government has not cited any evidence that Thomas actually recruited the guides, the court also might have concluded that Thomas was at least formally responsible for organizing the guides for the purpose of carrying out the crime. Thomas held the outfitter's license, so he was legally the guides' employer. *See* Appellee's Supp.App. at 194–97. Therefore, although the evidence of Thomas's supervisory role is sparse, we cannot say that the court clearly erred by finding that Thomas was a manager or supervisor under section 3B1.1(b).

We therefore AFFIRM the appellants' convictions and sentences, as well as the district court's denial of their motion for acquittal or a new trial.